King, J.
This is the ease of The Toledo Consolidated Street Railway Co., plaintiff in error, against Fred Mammet, administrator of the estate of Frank Mammet, deceased, and also The Lake Shore & Michigan Southern Railway Co. and the City of Toledo, defendants in error, who also file cross-petitions in error.
It appears from the record in this case that the plaintiff below, Fred Mammet, the representative of the estate of Frank Mammet, claimed that his intestate was killed by the falling of a bridge on St. Clair street, in the city of Toledo, where it crosses the Lake Shore & Michigan Southern Railway Co’s. tracks overhead; that the bridge was originally erected by, or that the duty to maintain it was upon, the Lake Shore & Michigan Southern Railway Co. by a statute, and also upon the city by a statute, which places upon the city the duty and obligation of keeping its streets open and in repair, and free from nuisance; also that the intestate at the time he was killed was in the employ of the Toledo Consolidated Street Railway Co., and that his employer,together *593 er with the other two defendants whose duty it was to maintain this structure, knew, or ought to have known of its dangerous condition, and that his intestate did net know of that condition.
All of the defendants answered to the petition below, denying all the allegations of negligence charged against each of them, and the Consolidated Street Railway Co. and the City of Toledo averred that the intestate’s injury which caused his death was occasioned by bis own negligence, or that his negligence' contributed to his injury; the Lake Shore & Michigan Southern Railway Co. not putting that into its answer.
The case was tried, and is before us upon a record which is somewhat voluminous, and contains many objections and exceptions, and I shall content myself with noticing only those which I deem of the most importance. Some of .the questions which arise the court.is relieved now of examining originally, because they have been determined by this court and the decision of this court affirmed by the supreme court, in the case of The Toledo Consolidated Street Railway Co., plaintiff in error, v. Thomas Sweeney, defendant in error, who brought an action for injuries which he received in the same accident and at the same time that the plaintiff’s intestate w.as killed. The verdict in this case was in favor of the plaintiff below in the sum of $5,000.
The principal errors claimed before us are, that the verdict is not sustained by evidence as to the Lake Shore & Michigan Southern Railway Co., (I think that claim is made by that company, and not urged especial^ by the others, although it is alleged in the petitions in error); that, taken in connection with the evidence offered, there was error in the charge of the court, as bearing upon the contributory negligence alleged by the defendant below, and also error in the charge upon the elements which the jury might consider in estimating damages; and that the amount allowed is excessive.'
Briefly stated, the evidence in this case shows that this bridge was constructed in 1887, of wood, principally, and was a truss bridge; and that when it came to fall, its fall was due to the rotting of timbers which were partially or perhaps entirely covered by an iron strap and by. timber placed over it so that it was not observable from the outside; and it had rotted away so that the foot of one of the braces of the truss shoved out, and kept shoving out further and further, until the bridge fell down of its own weight, *594 pretty nearly. It appears form the record that a day or two before this accident, the employes of the Consolidated Railway Co. had noticed that the bridge had sagged, and that it had been talked over among them; blit it is not entirely clear by the record whether it was communicated to the superior officers before the day preceding the accident. At any rate, on the day preceding the accident, it did come to the knowledge of the general manager and the general superintendent that there was some trouble with the bridge, and accordingly, at 9 or 10 o’clock in the night time, they went out and looked it over with a lantern; and, according to the testimony of one of the witnesses who was called, Mr. Stahl, who came along as a motorman running a car, Mr. Denman, the general superintendent, said to him that the bridge was-all right: “it was good for a thousand.” He went on with his business, and the officers went home. They were called in the course of the trial, and testified that they were there and examined the bridge with a lantern, and found it all right, but did not communicate that to Mr. Stahl or anybody else. The next morning the matter was further discussed m the car barn in the presence of twelve or fifteen men in the employ of the road, and a witness who was called, who was a transfer agent at the Cherry street barn, testified that he called up Mr. Denman by telephone, and asked him about that bridge, and he said that he had inspected it the .night before and it was all right, and he need not worry; and the witness communicated that to all the men who were present. Among them was a man of the name of Sweeney, who recovered the other judgment. Sweeney was a conductor. Whether Mammet,the de'cceaed, was in the barn or not none of the witnesses are able to say. At any rate, Sweeney went out on his trip on the car of which he was conductor, and continued all day in the neighborhood of the bridge. In the afternoon his car became disabled,and Mammet came along with his car and pushed the one that -Sweeney was in ahead of it, intending to take it into the car barn. During the forenoon of this day of the accident, its condition came to the knowledge of the city civil engineer. First, his assistant went and examined it, and telephoned to the office of the city civil engineer, stating that the bridge was in a dangerous condition. The city civil engineer was not in at the moment, but the knowledge came to him, and he telephoned to the local engineer of he Lake Shore & Michigan Southern Railway Co. at 11 o’clock in the morning that the bridge was in a dangerotis condition, and he should fix it immed *595 iately,and he replied that he would attend to it. Thereupon this city civil engineer who made this examination and communicated the result of it to his chief, and the general superintendent and the general manager of the Consolidated Street Railway,and the city civil engineer, and the engineer of the Lake Shore & Michigan Southern Railway Co. proceeded to do nothing more about it. It remained there until about 6 p. m., when it fell down with -the weight of two empty cars propelled over it, loaded with the conductor of one and the conductor and motorman of the other and two passengers, and in that fall Mr. Sweeney was very seriously injured, and Mr. Mammet was killed.
Now, as to the question whether the verdict against the Lake Shore is sustained, I only need to say a word. It is clear, the enigneer of that company himself testifies, that he received a communication about the condition of the bridge at 11 o’clock in the forenoon. What he did about it was to telegraph to the superintendent of bridges at Cleveland, or somewhere, that this bridge needed attending to. He left the bridge in the same condition, and without any further warning and without any further care on the part of the Lake Shore Co. It was suggested by this court in the Sweeney case, that perhaps the Lake Shore Co. would not have the-right to go upon this bridge and close it up, although they would have a right, and certainly it would be their duty, to take some measure of precaution, to warn people to keep off of it. Further consideration leads us to say, that if the duty of keeping that bridge in repair was imposed upon the Lake Shore, and counsel for the Lake Shore admit that the duty was imposed upon it to build and maintain this bridge, and keep it in repair, then we think the duty was imposed upon it, and it had the same right as the city to close it, in case there was any such a defect as to make it dangerous for people to pass over it. It had the same right, and it was its duty to close it up and repair it as had the city. I can’t see any distinction between these two defendants, the municipal corporation and the railway company. Therefore, the verdict is not against the weight of evidence as to the railway company.
The evidence that was submitted in this case, bearing upon the question of the knowledge which Mammet had acquired of this defect, and which his administrator claimed should operate in his favor, was all, or nearly all of it, objected and excepted to by the Consolidated Railway Co. It in substance amounted to this, as I have stated, that the informa *596 tion was communicated in the car barn in a general way; that Mr. Lang, the general manager, and Mr. Denman, the general superintendent, had inspected this bridge, and they found it all right; and the evidence in the case shows that it was communicated to Mr. Sweeney by a man named Mr. Felton at the barn, and that Mr. Sweeney on this trip when he broke down, when he came across Mr. Mammet, told him what Mr. Denman had said as reported in the barn, that it was all right, and not to worry. This is objected to, by the Consolidated Railway Co., on the ground that it makes a different case than that set forth in the petition; and there was considerable argument devoted to the idea that the case they undertook to make in the evidence was the case decided by the supreme court in 49 Ohio St., entitled Coal Co. v. Norman, in which it was held that it would be necessary, in case it was claimed that the employe, after having been informed of the danger, continued to work in a dangerous place, for him to aver in his petition and preve on the trial that when he went to work it was under a promise and belief that the defect shiuld be remedied. But in our judgment that is not the case made here in the petition, nor is if the case made on the trial. There was no promise made to remedy this defect. On the contrary, the Toledo Consolidated Co., by its officers and agents, if they said anything about it at all, said to their employes that the bridge was all right; that it was not unsafe,but that it was safe. And so, of course, no promise to repair was made. These officers testify that they went there and made this examination,and they found it all right, but they communicated that fact to nobody. I doubt tnat a little. In view of the fact that these employes were inquiring about that bridge — and it appears all through the record that they had known it for two or three days, and it was a matter of general conversation among them — it would be a little strange that these officers should say nothing about it, and that their employes should all continue to ride over the bridge as they had been doing. If the testimony is to be relied upon that Mr. Denman said, when1 telephoned to, that the bridge was all right, and not to worry, and this was communicated to Mr. Sweeney, and by him to Mr. Mammet as coming from the responsible officers of this corporation — those who had charge of the wires, tracks, cars and apparatus of this railway, certainly he would have the right to rely upon it, and would have a right to believe it, and to assum« that they knew about and would guard against the danger; not necessarily the defect *597 that was in the bridge, but the danger from the defect. He knew there was a defect to this extent; he knew that the bridge sagged. Whether that was dangerous or not might be a question requiring some investigation by some skilled man. When the general superintendent of the road, whose duty it was to inspect all these appliances, t-old him he had inspected the bridge, or communicated to the employes that he had inspected the bridge,and that it was all right,he would have- the right to rely upon it. In the Norman case the court said they were to pass upon the question whether the petition stated a cause of action ; and it was objected that while the petition stated that the falling of the roof and the injury to the decedent occurred without fault on his part, it did not aver that he was without knowledge of the unsafe condition of the roof at and prior to the accident, or that having such knowledge he informed the company, and continued in its employment on its promise to remove the danger. Now, there is no element in this case requiring proof tnat Mammet continued to work relying on the promise of this company to repair this bridge, because the proof is upon the part of the consolidated Company, and not upon the part of the plaintiff, as that there was no danger, and there was no defect that would occasion danger. So the evidence objected to was certainly competent, under the petition.
Bearing now upon the question whether Mammet, when he went upon the bridge was in the exercise of ordinary care, in that connection it is objected that the court erred in its charge, especially as it gave this request, among other things (and the court in its general charge said substantially the same thing embodied in its request). It is the first request of the Consolidated Railway Company:
“In an action by a servant against his master, such as this is, the plaintiff must prove by a preponderance of evidence want of knowledge on his part of the defect causing the injury. ”
And the court added: “and of the dangerous condition resulting therefrom, or that, having such knowledge, he informed the master and continued in his employment upon a promise, express or implied, to remedy the defects; otherwise he cannot recover from the master.”
Now, the Consolidated Railway Company having objected to the admission of this testimony on the ground that the petition did not authorize its admission, because there was no allegation that the master had promised to remedy the defects, upon which the servant relied, it is a little strange that it would ask the court to charge the jury precisely that *598 proposition, and upon its request the court gave the proposition. In my judgment,, it had nothing to do with the case. It was nGt applicable, and it cannot complain about it, for it asked the court to give it, and the court gave it, as he gave most all of the requests. It will be noticed there were three defendants, each of whom submitted a string of requests to give to the jury as its view of the law. The court was between those three fires as between all of the defendants, and the plaintiff. The Consolidated Railway Company can not complain of the court having given that, although it was not applicable to the case. The point in issue was all the time, the question of notice and knowledge of the danger which he was assuming when he went upon this bridge, and whether, going upon, it as he did, he was in the. exercise of ordinary care. That was the only question there was in the case, bearing upon his negligence, and the court submitted it to the jury — not whether he had been promised that this defect should be repaired, because that did not appear in the case from one end to the other.
It is claimed that the court erred in its charge to the jury upon the question of the amont of damages. The charge in that respect majr not be all that could be desired. Bub again, these defendants seem to have been a little to blame, if they desired to object to that charge. The court charged the jury in the commencement of its charge by reading the statute upon that subject. That was proper, since it is the law of this state; and in reading it to the jury the court gave them from the first source just exactly what the legislature had said upon that subject. The court read that section which provides that “every such action shall be for the benefit of the wife or husband and parents and children, of if there be neither of them, then of the next of kin, of the person whose death shall be so caused, and it shall be brought by and in the name of the personal representative of the person deceased; and in ever such action the jury may give such damages not exceeding in any case $110,000, as they may think proportioned to the pecuniary injury resulting from such death, to the persons, respectively, for whose benefit such action shall be brought.” The court gave that to the jury as the law of this case. To that extent the court was certainly entirely correct. If the court gave nothing further on that subject, the charge co.uld not be excepted to on that ground,and the court said nothing further to the jury on that subject, except in this way: when these parties submitted their requests, among others, the plaintiff submitted a,request, and the court gave that which to acertain extent *599 was a modification or an extension of the definitions which governed the elements of damage which the jury might consider :
“If you find in favor of the plaintiff and against all the defendants, or two of them, or any one of them, you will render a verdict for such damages as will compensate the parents and next of kin of decedent for the lóss they have sustained by reason of his death, taking into consideration his age at the time of his death,his health, the wages he was earning, his prospects in life, and his expectation of life.”
That was all proper. Defendants complain that this does not take into consideration other elements which the jury might consider, to-wit: the age of his parents and min- or children, their capacities to earn money, and how long they probably would live, and finally wind up- by their expectation, or their reasonable expectation, of what they would have received from this man if he had lived. As I say, those three defendants submitted each of them a string of propositions to the court to charge, which the court eventually gave as nearly as it could, nearly all of them. If the rule laid down by the statute, taken in connection with the request of the plaintiff upon those elements which the plaintiff desired to have submitted to the jury, did not charge the law as the,defendants believed it ought to be, or give them all the law which might be given upon that subject, they were at perfect liberty, either of them, to have asked the court to charge further upon that subject; which they did nob do, but sat by, and availed themselves simply of their right to except. Now, the supreme court have several times passed upon that question, and upon this same question in the case of Railway Co. v. Murphy, 50 Ohio St. 185, wherein the court gave this charge:
“If the jury should find from the evidence that the defendant is guilty of ordinary negligence, and that the same resulted in the death of Anthony Murphy, and also that the deceased was without fault in the premises, then the plaintiff is entitled to such damages as the jury may deem, from the evidence and proofs, a fair and just compensation therefor, having reference only to the pecuniary injuries resulting from such death, to the widow and next of kin, not exceeding the amount claimed in the petition.”
That is all the court said: that is all they were asked to say. The Supreme Court say, on page 145:
“Objection is also taken to the charge as to the rule of *600 damages. To the extent which the charge goes it is in accord with the statute, and is correct. Had more specific instructions been thought necessary they should have been requested.1 ’
That doctrine is applicable to the case at bar; and if they desired more^specific instructions upon this question as to the elements which enter into damages in a case like this, then it was the duty of conusel to request the court to give such further instructions on that subject.
It has been argued at considerable length that this verdict is excessive. This was a young man, 28 years of age. He was employed on a salary of $1.80 a day; cf good health; living at home with his father and mother; he was unmarried,boarding there. He paid for his board — not exactly for his board, but contributed to the support of the family, to the extent of $10 every two weeks in one season of the year, and more in other seasons. There were three minor children, two brothers and a sister of the deceased. The jury had all that before them. The argument was in this same case to which I have referred, that there was not any evidence in the record to show affirmatively that the next of kin had sustained any pecuniary loss. Although it was a husband who was killed, there wasn’t a word of testimony that he supported his wife. And the couft say:
“1. As to the request to charge. It' is urged that the instruction asked should have been given, because:
“First — It does not appear affirmatively that the next of kin sustained any pecuniary loss. The tendency of the evidence is stated in the syllabus, and need not be repeated. From the facts thus shown, we are asked to presume that the deceased did not contribute anything to the support of his wife or children, and hence that his life was of no value to them. We think the presumption does not follow. It was his legal, as well as moral, duty, to contribute of his wages to the support of the wife and minor child, at least, and the i iference, in the absence of a showing to the contrary, is that he did his duty. But aside from this: a right of action is given by the statutes, secs. 6184, 6185. It is for the benefit of the widow and children. The petition states a case under the statute. The proof tended to sustain the petition. To hold as requested, on the ground urged by counsel, would be to ignore the statute.”
The statute has been many times quoted, and is cited by the court here in the charge to the jury, its language is peculiar:
“Every such action shall be for the benefit of the wife or husband and parents and children, or if there be neither of *601 them, then of the next of kin, of the person whose death shall be so caused, and it shall be brought by and in the name of the personal representatives of the person deceased; and in every such action the jury may give such damages not exceeding in any case $10,000, as they may think proportioned to the pecuniary injury resulting from such death, to the persons, respectively, for -whose benefit such action shall be brought.”
FrankH. Kurd,, Attorney for Mammet.
Smith & Baker, Attorneys for Consolidated Street Ry. Company.
E. D. Potter, Jr., Attorney for L. S. & M. S. R. R. Co. . O. W. Watts, City Solicitor, for City..
The jury may give such damages as they may think proportioned to the pecuniary injury. Not saying now that the court will not review the action of the jury on that subject in a case where the damages are in excess of what the proof shows could be possibly the pecuniary injury to the next of kin — we think that in this case a verdict of $5,000 ought not to be disturbed by the court on that ground. That is one of the questions so peculiarly placed by the statute in the control and charge of the jury, that it certainly must appear that their verdict is grossly excessive and out of proportion to what the evidence shows could possibly be the pecuniary loss to these next of kin. It would seem from the statute that the question is very largely left to the jury to determine, and intentionally left to them, by the legislature. And the limit which they may give is placed, too, in the statutes itself,at $10,000. It is quite likely a case might arise in which the court would control the discretion of the jury; but in view of the relationship of this young man to such a large family, it can not be said that the jury were excessive m allowing $5,000. It certainly is true, in my judgment, that the court has no right, in passing upon a verdict under this statute, to apply to it any rule from any table of probability; the jury does not necessarily base their verdict upon fixed mathematical tables,and it is not the object and intention of the statute that they should; but they shall give such sum as they deem reasonable, in proportion tc the pecuniary injury. And we cannot say that they have exceeded that.limitation in this case.
Without passing upon any of the errors — we have looked over the record very carefully — it is sufficient to say that we do not find in them or in those which I have mentioned, any error to the prejudice of’ any of these defendants. Therefere, this judgment will be affirmed, without the penalty.